United States Court of Appeals,

Fifth Circuit.

No. 96-20597.

Wanderlon Ann BARNES, Plaintiff-Appellee,

v.

Arthur J. LEVITT, Jr., in his official capacity as Chairman of the United States Securities & Exchange Commission, et al., Defendants,

Arthur J. Levitt, Jr., in his official capacity as Chairman of the United States Securities & Exchange Commission, Defendant-Appellant.

July 31, 1997.

Appeals from the United States District Court for the Southern District of Texas.

Before DAVIS, STEWART and PARKER, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

Appellant, Arthur J. Levitt, Jr., in his official capacity as Chairman of the United States Securities and Exchange Commission ("the Chairman") appeals the judgment for Appellee Wanderlon Ann Barnes ("Barnes") on her employment discrimination claims. Finding that the district court lacked jurisdiction over her claims, we reverse.

FACTS AND PROCEEDINGS BELOW

Barnes is an African-American female who was employed as a staff attorney in the Houston Branch Office of the Securities and Exchange Commission ("SEC") from August 28, 1988 until September 6, 1991. Joseph C. Matta, an Hispanic male, served as the Branch Chief of the Houston Branch Office from April 1986, until October 1987, when he was promoted to Assistant Regional Administrator in

the same office.  When he became Assistant Regional Administrator, Joy Boddie, an African-American female, replaced him as Branch Chief until she was transferred to the Chicago office.  Nancy McGinley, a Caucasian female, succeeded Boddie as Branch Chief and remained in that position throughout the remainder of Barnes's employment.  Boddie, and later McGinley, served as Barnes's immediate supervisors and their immediate supervisor was Matta.

During her first year, Barnes had a good relationship with both Boddie and Matta and received "outstanding," the highest possible rating on her annual performance evaluation.  In September 1989, Barnes's supervisors strongly urged her to attend a training conference in Austin, Texas along with the other attorneys in the Houston Branch office.  She refused, telling her supervisors that she would not be going for personal reasons.  In court she testified that the real reason she refused to attend was that she did not like to fly and that she thought that she would have to ride to the conference with Matta.  She did not want to ride with Matta because she had heard rumors that he had sexually harassed someone in the past and she did not like his tendency to "talk on and on and on and on and repeat himself over and over again." Matta never asked Barnes to travel to the conference with him nor did he know the reason for her refusal.  Barnes testified that after the conference her relationship with Boddie and Matta soured and they began to criticize her work in ways that she thought were unfair.

In late 1989, about the same time Barnes begin to have trouble

with her supervisors, Adrian Martinez was hired as a staff attorney in the Houston Branch Office. Martinez, like Matta, was an Hispanic male. His starting salary was higher than Barnes's starting salary, but the same as her current pay rate. In February of 1991, Martinez received a pay raise and was then making more money than Barnes. When Barnes learned about Martinez's pay raise, she sought counseling with the SEC's Office of Equal Opportunity ("EEO") complaining of disparate treatment by Matta on the basis of race with respect to work assignments, promotions, time and attendance, working conditions, and support staff assistance. Susann Reilly, the EEO counselor who was assigned to handle the informal complaint, interviewed Barnes on numerous occasions, interviewed twenty individuals identified as witnesses to the events forming the basis of the claims and prepared a Counseling Report. After approximately four months of investigation, Reilly contacted Matta's supervisor to explore settlement options. However, because Barnes's demands could not be acted upon within the one-week time frame Barnes stipulated, Reilly finalized the EEO counseling report and sent Barnes a notification of her right to file a formal administrative EEO complaint.

On August 23, 1991, Barnes's attorney, Beville May ("May"), sent the SEC a formal EEO complaint and on September 3, 1991 submitted an amended formal EEO complaint. Barnes did not sign either complaint as required by the EEOC regulations then in effect. *See* 29 C.F.R. 1613.214(a)(1). The amended EEO complaint alleged, *inter alia,* that from autumn of 1989 until September

3

1991 (1) Matta subjected Barnes to a campaign of racially and sexually motivated harassment; (2) Matta subjected Barnes to disparate treatment and work sabotage; (3) Matta retaliated against Barnes after she filed her informal EEO complaint; (4) Matta sexually propositioned Barnes and others at the Houston office; (5) "other senior officials," including former regional administrator Edwin Tomko, created a hostile and offensive environment, and that their conduct included rape, sexual assault, sexually suggestive mannerisms, leering, dirty and racist jokes; and (6) Barnes's mail was tampered with, her telephone calls monitored, and her life threatened after filing her EEO complaint. In response to the complaints, the SEC began an investigation (eventually interviewing approximately thirty people) and immediately placed Matta on indefinite leave status.

On Monday, September 9, 1991 Barnes started a job as an attorney at the Resolution Trust Corporation ("RTC") earning the same salary she was then making at the SEC. On that date, she told the SEC that it should consider her constructively discharged as of September 6, 1991.

The SEC requested that Barnes provide information, such as the names of the SEC officials who had allegedly engaged in the misconduct, the specific conduct engaged in, the identities of the alleged victims and when the alleged conduct occurred. On September 10, 1991, Barnes's attorney, Beville May responded to the requests in writing, stating:

> It is correct that I have declined to provide detailed
> information supporting the allegations in Ms. Barnes' Formal

4

Complaint of Discrimination to the Commission.  The reason for this refusal, however, was because the SEC has had the information for years and refused to conduct a meaningful investigation and/or do anything to stop it.

May repeatedly declined to cooperate with the SEC investigation, remarking that "you will get it in discovery" and rather than "provide any specifics" she "intended to file a complaint in court."[1]  While declining to discuss the complaint with the SEC, May granted an interview to a newspaper reporter with the *Houston Chronicle.*  A front page article quoted May as stating that an EEOC "complaint filed August 27 claims Matta sexually assaulted a female employee" and "that Matta overlooked rapes by other men in the six-person office," when, in fact, the complaint did not make those allegations against Matta.  *See Matta v. May,* No. 96-20418, --- F.3d ---- (5th Cir.1997)(discussing the defamation claim against May arising out of the newspaper article).

Despite the lack of cooperation from Barnes, the SEC appointed special EEO investigators who interviewed approximately thirty past and present SEC employees.  Several additional former employees declined to be interviewed.

By letter to attorney May, the SEC informed Barnes that she had an obligation under the applicable regulations (29 C.F.R.

---

[1]During the administrative complaint stage, attorney May made repeated references to *Broderick v. Ruder,* 685 F.Supp. 1269 (D.D.C.1988), where May had successfully represented a plaintiff who brought sexual harassment claims against the SEC. One of May's letters to the EEOC investigator took issue with a letter sent to Barnes and advised the investigator, "You might just find yourself Absent Without Job. Your predecessor is named in the *Broderick* decision as a result of tangling with me.  I wouldn't seek out that kind of notoriety if I were you."

1613.216(b)(2)) to cooperate with the investigation, by providing sworn testimony and documentation concerning her complaint and that the failure to do so could cause cancellation of her complaint. May responded that Barnes would give a deposition only if the SEC provided her a copy of Reilly's EEO report. The agency agreed to release the report, but needed May to sign a routine confidentiality agreement, agreeing not to disclose any nonpublic information about ongoing SEC securities fraud cases. May never executed the agreement or attempted to amend the agreement, despite repeated efforts by the SEC to accommodate any concern she might have.

On January 29, 1992, the SEC sent Barnes a letter stating that if she maintained her lack of cooperation, the agency would cancel her complaint. Barnes then agreed to provide a deposition, which was scheduled for February 5, 1992. On February 4, May informed the SEC that Barnes would not attend the deposition because she had surgery scheduled for the next week, but made no attempt to reschedule the deposition or to claim that Barnes's health prevented her participation in the scheduled deposition. The SEC asked May to agree to extend the 180-day period for filing suit, which would have expired on February 23, 1992, but she refused.

On February 20, 1992, the SEC sent Barnes a letter canceling her complaint for her failure to cooperate. The letter detailed Barnes's allegations, the agency's investigation, and the need for more information from Barnes. On March 23, 1992, Barnes filed this civil action under Title VII, 42 U.S.C. § 2000e and the Equal Pay

6

Act, 29 U.S.C. § 203.  After bench trial, the district court found that the SEC had essentially completed its investigation, except that it wanted Barnes's deposition, holding that the "fact that the SEC wanted to close its investigation with Barnes's deposition and was unable to get the deposition within the SEC's time frame is no reflection on Barnes's cooperation."  The district court held that Barnes acted in good faith and made reasonable efforts to provide the necessary information to the SEC. On the merits, the district court concluded that Matta's conduct "represented a pattern and practice of discrimination against plaintiff based on both her gender and race."  The district court awarded Barnes $275,426 in back pay under Title VII, $53,983.50 for "lost fringe benefits" under Title VII, $210,468 as liquidated damages under the Equal Pay Act, $283,856 in attorneys' fees and adopted the injunction order entered in *Broderick v. Ruder,* 685 F.Supp. 1269 (D.D.C.1988).[2]

JURISDICTIONAL PREREQUISITES FOR TITLE VII ACTION

The filing of an administrative complaint is a jurisdictional prerequisite to a Title VII action.  *Dollis v. Rubin,* 77 F.3d 777, 781 (5th Cir.1995).  Further, a complainant must pursue and exhaust his administrative remedies prior to filing a judicial complaint. *Johnson v. Bergland,* 614 F.2d 415, 417 (5th Cir.1980).  If the agency does not reach the merits of the complaint because the complainant fails to comply with the administrative procedures the

_____

[2]In *Broderick,* the district court for the District of Columbia entered a consent order in a sexual harassment case arising out of a SEC field office in Virginia.  The order included an injunction against sexual harassment of SEC employees.

7

Court should not reach the merits either. *Id.* at 418.

As a threshold matter in the trial court, the Secretary contended that the court lacked jurisdiction over Barnes's claims. The district court held that Barnes sufficiently exhausted the administrative procedures available to her, finding that Barnes acted in good faith and made reasonable efforts to provide the necessary relevant information to the SEC.

On appeal, the Secretary argues that the district court erred in finding that Barnes acted in good faith and with reasonable effort. He alleges that the record establishes that Barnes failed to cooperate with the administrative procedures and the district court therefore lacked jurisdiction over her Title VII claims. We agree.

Title VII describes the procedure for bringing a civil action alleging discrimination:

> Within thirty days of receipt of notice of final action taken by a department, agency, or unit ... or after one hundred and eighty days from the filing of the initial charge with the department, agency or unit or with the Equal Employment Opportunity Commission on appeal from a decision or order of such department, agency or unit until such time as final action may be taken by a department, agency, or unit, an employee or applicant for employment, if aggrieved by the final disposition of his complaint, or by the failure to take final action on his complaint, may file a civil action as provided in section 2000e-5 of this title....

42 U.S.C. § 2000e-16(c) (1989).

The 180-day provision essentially allows the claimant to appeal to the district court if there has not been final agency action on her claim after six months from filing the claim with the agency. *Munoz v. Aldridge,* 894 F.2d 1489, 1492 (5th Cir.1990).

8

There is no dispute that more than 180 days passed between the time Barnes filed her formal complaint and the time she filed her Title VII action in district court. However, it is well established that, notwithstanding the passage of 180 days, plaintiffs who resort to the administrative process but do not cooperate in the proceedings can thereby fail to exhaust their administrative remedies. *Johnson v. Bergland,* 614 F.2d 415, 418 (5th Cir.1980)(finding no federal court jurisdiction where plaintiff's administrative complaint "described general situations that could have occurred at any time; ... [and] did not set out any specific incidents or dates of discrimination"). The purpose of exhaustion is to give the agency the information it needs to investigate and resolve the dispute between the employee and the employer. "The test for cooperation in the administrative process is a common sense one, geared to the functional demands of dispute resolution." *Id.* at 1493. Good faith effort by the employee to cooperate with the agency and the EEOC and to provide all relevant, available information is all that is required to demonstrate an exhaustion of administrative remedies. *Id.* After reviewing the record, we conclude that Barnes did not act in good faith or make reasonable efforts to provide the necessary relevant information to the SEC after filing her formal complaint. She repeatedly refused to answer questions, provide details, make a statement, give a deposition or even sign her complaint. Even after extensive investigation, the EEOC did not have the information it needed to pursue and resolve Barnes's dispute with the SEC. It is clear that

9

as to her gender and sexual harassment claims, which were only marginally referenced in the informal process, she wholly failed to exhaust her administrative remedies.

The factual bases of Barnes's claims of racial discrimination were better developed during the informal phase of the administrative process than were her sexual harassment and gender discrimination claims.  This case presents the question whether a plaintiff who cooperates during the investigation of her informal complaint but refuses to cooperate after filing a formal complaint may rely on her earlier cooperation as the basis of exhaustion. The answer in this case is that she may not.  While we recognize that a plaintiff need not participate in a futile exercise, *see Jordan v. United States,* 522 F.2d 1128 (8th Cir.1975), the record does not support the conclusion that the EEOC's formal complaint process would have proven futile if Barnes had participated in good faith.  During the informal complaint stage, Barnes took the position that Matta did not treat her fairly because of her race. Even after the EEO investigator raised questions about the possibility of gender discrimination and sexual harassment, Barnes failed to attribute her problems with Matta to such discrimination during the informal process.  However, in the formal complaint, sexual harassment and gender discrimination figured prominently in Barnes's explanation for her alleged suffering of disparate treatment illustrating the inconsistencies between her formal and informal complaints.  Cooperation in an earlier informal process is not sufficient to satisfy the obligation to exhaust administrative

10

remedies by cooperating in a subsequent formal investigation. Further, the record indicates that the EEOC took both Matta's formal and informal complaint seriously, devoting extensive time and resources to investigating the claims, as well as suspending Matta until the allegations could be resolved. Had Barnes complied with the SEC's requests for cooperation, the agency could have ruled on the merits of her complaint. Due to Barnes's refusal, it was unable to do so and canceled the complaint. The law affords the agency discretion to cancel a formal complaint on the ground that the complainant has failed, after due opportunity, to supply the agency with the information sufficiently specific to enable it to conduct a meaningful investigation. *Johnson v. Bergland,* 614 F.2d 415, 418 (5th Cir.1980). We find that the agency did not abuse its discretion in canceling the complaint in this case. Further, a complainant may not be dilatory at the administrative level, wait for the 180 days to pass, and then invoke the jurisdiction of the federal court. *See Id.* Because Barnes refused to cooperate, thereby failing to exhaust her administrative remedies, the district court lacked jurisdiction to adjudicate her Title VII claims. *See Id.*

JURISDICTION OF THE EQUAL PAY ACT CLAIM

The district court also lacked jurisdiction over Barnes's claims asserted against the United States under the Equal Pay Act. Under the Tucker Act, 28 U.S.C. § 1491, a plaintiff asserting an Equal Pay Act cause of action must bring that action in the Court of Federal Claims if the claim, including the fees sought, exceeds

11

$10,000. Because Barnes's claim greatly exceeded the jurisdictional limit, the district court lacked jurisdiction to adjudicate the claim. *See Wilkerson v. United States,* 67 F.3d 112 (5th Cir.1995). Although this issue was not raised below, a jurisdictional matter cannot be waived and can be raised at any time. *See Graham v. Henegar,* 640 F.2d 732, 734 n. 4 (5th Cir.1981).

## CONCLUSION

Because the district court lacked jurisdiction to hear Barnes's claims, we reverse the judgment for Barnes, positing no opinion on the merits of those claims.

REVERSED.

12